**CALIFORNIA PACKING CORPORA-
TION et al., Libelants,**

v.

**STATES MARINE CORPORATION OF
DELAWARE, Respondent.**

**No. 27396.**

United States District Court
N. D. California, S. D.

Sept. 23, 1960.

McCutchen, Doyle, Brown & Enersen, Russell A. Mackey, Bryant K. Zimmerman, San Francisco, Cal., for libelants.

Dorr, Cooper & Hays, San Francisco, Cal., for respondent.

ROCHE, District Judge.

Joined in this action are seven causes of libel for damages to canned goods shipped aboard seven vessels owned or operated by respondent. The parties seek an interlocutory order affixing liability, the issue of damages having been reserved for subsequent determination.

All of the voyages in question took place in the years 1954 to 1956 and were intercoastal trips from west coast ports to the gulf coast via the Panama Canal. Six of the seven—all but the Beaver State—were winter or early spring voyages commencing at, ports where the temperatures were considerably lower than those which were later encountered passing through the sub-tropics. The Beaver State left the west coast in August and temperatures were relatively stable throughout the voyage. With the exception of the Pelican State, each vessel stopped at Havana to discharge cargo before proceeding on to the gulf coast ports for which libelants' cargos were destined. Each vessel except the Ocean Deborah encountered rain either on the voyage or while loading or discharging cargo.

There is little dispute that substantial portions of the damages incurred

by libelants are attributable to "sweat," i. e., condensation which forms when the temperature of the air falls below its dew point. The danger of sweat is not uncommon on wintertime intercoastal voyages, but sweat is considered to be a peril of the sea—for which the carrier is not liable—only when all available and reasonable precautions are taken to avoid it. Clark v. Barnwell & Ravenel, 1851, 12 How. 272, 53 U.S. 272, 13 L.Ed. 985; Wessels v. The Asturias, 2 Cir. 1942, 126 F.2d 999.

■■ The burden of explanation is upon the carrier; he must convince the court that he is not to blame for the shipper's losses. Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Schroeder Bros. Inc. v. The Saturnia, 2 Cir.1955, 226 F.2d 147. It is not the position of this court that to avoid liability respondent must provide a fully comprehensive, detailed and spotless account of everything that transpired on voyages that were made five years ago. But to carry his burden respondent must offer evidence sufficient to convince the court that his policies were prudent and his manner of execution reasonably competent. As respondent maintains, if he can show due diligence in protecting the cargos, he need not show how the damage did, in fact, come about. George F. Pettinos, Inc. v. American Export Lines, D.C.E.D.Pa. 1946, 68 F.Supp. 759. But where the record discloses policies, the wisdom of which is questionable, or conduct in which it is doubtful that the carrier has exercised due care, it is difficult to see how respondent can carry his burden—as this court defines it—without establishing a reasonable alternative to his own negligence as a probable cause for the damage. California Packing Corporation v. Empire State, D.C.N.D.Cal., S.D. 1960, 180 F.Supp. 19. "Where the state of the proof is such as to show that the damage is due either to an excepted peril or to the carrier's negligent care of the cargo, it is for him to bring himself within the exception or to show that he has not been negligent * * *.

Similarly, the carrier must bear the entire loss where it appears that the injury to cargo is due either to sea peril or negligent stowage, or both, and he fails to show what damage is attributable to sea peril." Schnell v. The Vallescura, supra [293 U.S. 296, 55 S.Ct. 197].

■■ It is libelants' burden to show that the goods in question were delivered to the carrier in good order and condition and that the carrier tendered delivery of the goods in a damaged state. Respondent contends that libelants have failed on both points to make a prima facie case. Libelants rely chiefly upon respondent's failure to admit or deny—within fifteen days after service thereof—certain requests for admissions which, if admitted, establish that the cargo shipped under each bill of lading was received by the carrier in apparent good order and condition and that portions of each shipment were delivered—or tendered for delivery—to the consignees with evidence of moisture damage. Rule 36 of the Federal Rules of Civil Procedure, 28 U.S.C.A. states that "matters of which an admission is requested shall be deemed admitted unless, within a period designated in the request," denials or objections are served upon the requesting party. Here, without court order or apparent excuse, respondent failed to serve either denials or objections within the prescribed period; the matters therefore stand admitted.

■ Respondent further contends that even if the admissions are granted, they refer only to "portions" of the cargos and the burden is upon libelants to show exactly "which" cargo was damaged. But to require a further showing by libelants at this point would be to ignore the purpose of postponing a determination of damages. Libelants' proof that a portion of each shipment was damaged is sufficient basis for a determination of liability, the only issue now before the court.

■ Finally, respondent seeks to rely upon the rule of law that where inherent vice or insufficiency of packing may have

been the cause of cargo damage, libelant —to make a prima facie case—must prove that the goods were actually in satisfactory condition when delivered to the carrier. The Niel Maersk, 2 Cir. 1937, 91 F.2d 932, certiorari denied 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582. This contention was considered and discussed in two recent cases with substantially identical facts. California Packing Corporation v. Empire State, supra; California Packing Corporation v. P & T Voyager, D.C.N.D.Cal., S.D.1960, 180 F.Supp. 108. In summary, it may be said that in cases dealing with standard, uniform goods, where there is no substantial evidence that the goods were improperly packaged or were subject to inherent vice, and the conduct of the carrier is sufficient to account for the loss, the shipper will not be required to go beyond a showing of apparent good order and condition to establish his prima facie case. Karabagui v. The Shickshinny, D.C.S.D.N.Y.1954, 123 F. Supp. 99, affirmed Kupfermann v. United States, 2 Cir.1955, 227 F.2d 348.

The burden now shifts to respondent to show, by a preponderance of the evidence, that the ventilation practices employed on each of these seven voyages were sufficient to qualify—at the time and under the circumstances—as adequate measures to prevent or minimize sweat damage. Libelants contend that the court need go no further than to consider these practices in order to find respondent liable. It is libelants' view that "sealing of the cargo holds represented the only acceptable ventilation policy for canned goods." It is respondent's position that allowing ventilation— to a degree varying among the seven ships—constituted reasonable care and due diligence. To establish its position respondent offered the expert testimony of Vernon Watts, a marine cargo surveyor. But Captain Watts would go no further than to testify that concerning voyages of the type principally in question here, there are "probably general, various opinions as to ventilation" and that "either method you use, ventilating

or not ventilating, there are considerable elements of risk of incurring sweat damage." He explained that the danger in sealing the holds is that when they are opened in the warm, humid weather prevailing at Havana, the cans, having remained cold and dry, will then sweat. Whereas the hazard of ventilating on the voyage is that the warm, humid air through which the ship passes will cause the goods to sweat en route. On cross-examination, Captain Watts testified that the severity of rust caused by condensation varies directly with the length of time that the cans are allowed to remain wet; consequently, more severe damage may be expected if the cans are allowed to sweat en route. Although Captain Watts himself expressed no preference, the factors upon which he based his conclusions appear to make "sealing" the preferable practice.

Respondent offered the final report on "Evaluation and Control of Sweat Damage" prepared by the Stanford Research Institute, apparently to support his contention that it is extremely difficult to control sweat damage on vessels making stops at Caribbean ports. With this there is no dispute, but it is of little significance to the basic inquiry in this case: Has the carrier done everything which it may reasonably be expected to do to prevent or lessen damage? Far more significant—and decidedly damaging to respondent's position—is that portion of the excerpt quoted by respondent which states, "Control of dew point in the ship's hold prior to this exposure in the sub-tropics would undoubtedly reduce the extent of damage  *  *  * "

The final item in the matter of expert evidence is the testimony of Captain Noyes. He stated clearly and emphatically his opinion that sealing the holds is the best policy on these voyages.

■■ It is the opinion of the court that testimony from members of the ships' crews cannot be considered "expert" in the field of ventilation practices and therefore, such testimony is outweighed by that from qualified experts. The net result is that libelant has offered

no expert testimony or evidence which actually supports the ventilation practices employed on these voyages, but rather has offered evidence from which it may be inferred—in degrees of emphasis ranging to extreme—that a contrary practice is desirable. It is the conclusion of the court that respondent fell short of establishing his ventilation practices as satisfactory to meet his obligation of due care.

This conclusion is effective to summarily settle the issue of liability as to the first and fourth causes of libel, the voyages of the Green Harbour and the Ocean Deborah. Captain Reisvaag of the Green Harbour testified that he ventilated the holds every day as a routine practice; when ventilation was not desired the ventilators were simply turned alee, i. e., out of the wind. The chief officer from the Ocean Deborah stated that he employed occasional forced ventilation from Long Beach to the Panama Canal and that at no time were the exhaust vents sealed to effectively prevent air from entering the holds.

Nor is respondent's position appreciably better in the third, fifth and seventh causes of libel, the voyages of the Florence Luckenbach, the Monterey and the Seaborne. Captain Graber of the Monterey testified that he ran his blowers from time to time, that neither the "mushroom" ventilators nor king posts were sealed, and that generally, the ship's ventilation was not his concern. Apparently, at least the bulk of libelant's damaged cargo on the Monterey was stowed in deep tanks, but the court is not convinced that stowage in deep tanks is unaffected by the ventilation practices which are employed in the holds generally. Respondent failed to convince the court that these were adequate. Captain Graybill of the Seaborne testified in his deposition that his policy was to restrict ventilation on this type of voyage. But he was unable to testify—either from memory or from the ship's log—whether the holds were ventilated on the particular voyage in question or if any attempt was made to seal the exhaust ventilator

shafts. Since the burden is upon respondent, the inconclusiveness of his evidence must weigh against him. Moreover, there are log entries and bilge readings—not satisfactorily explained by respondent—which indicate that an excessive amount of rain water entered the holds of the Seaborne while the vessel was being loaded at Long Beach. Again, in the case of the Florence Luckenbach, the record is devoid of convincing evidence that the ship's holds were actually sealed to prevent ventilation.

There is nothing in the record to indicate that there is even a difference of opinion as to the advisability of sealing cargo holds on vessels that do not stop at Carribean ports. The Pelican State, on a winter voyage from ports in Washington and northern California to the gulf coast, made no stop in Havana. The temperatures prevailing at her ports of destination were no higher than the 60's. Yet, despite the facts that there was no necessity to open the hatches en route at Havana and the temperatures encountered on the voyage were—as could be expected—in the high 80's, the holds were not sealed to prevent the entry of hot, humid air. In fact, the only indication of any attempt to restrict ventilation on this voyage was the inadequate protection provided by trimming the ventilators to minimize wind intake. Respondent is clearly liable here,

The circumstances surrounding the voyage of the Beaver State differ from the pattern that has been established. This was a summer voyage, commencing in August, 1955. Temperatures were generally in the 70's and 80's as the vessel loaded cargo on the west coast and they did not rise appreciably throughout the remainder of the voyage. Under such conditions it is clear that the considerations which persuaded the court to hold respondent to a standard of strict non-ventilation on the voyages previously discussed are not applicable here. Nevertheless, the evidence does not amount to a clear and convincing demonstration of due care. Chief Mate Barboza testified that he followed what

he believed to be the standard ventilation policy "when leaving a cold climate to go into a hot climate." Apparently he took no cognizance of the fact that this was a summer voyage. He also testified that he trimmed the ventilators to minimize ventilation, but the ship's log notes repeatedly that the ventilators were "trimmed for maximum ventilation."

It is the conclusion of this court that respondent is liable for any and all damage incurred by libelants on these seven voyages which is attributable to sweat or wetting. Inasmuch as the court has not been convinced that libelant's losses are attributable in whole or in part to any other cause, respondent is liable for the full amount of moisture damage.

Libelants will submit Findings of Fact and Conclusions of Law in accordance with the foregoing.